**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division**

| | | |
|---|---|---|
| ROMINA MOZAFFARIAN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 8:21-cv-2854 |
| | : | |
| ADVANTAGE CREDIT, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**CLASS ACTION COMPLAINT**

COMES NOW the Plaintiff, Romina Mozaffarian, ("Plaintiff"), by counsel, and for her Complaint against Advantage Credit, Inc. ("Advantage Credit" or "Defendant"), she alleges as follows:

**PRELIMINARY STATEMENT**

1. When enacting the Fair Credit Reporting Act, Congress found that consumer reporting agencies "have assumed a vital role" in society, and there was a need to ensure that they "exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S. Code § 1681(a)(3)-(4). To accomplish Congress' goal, the FCRA contains several requirements to protect consumers, including § 1681e(b), which is one of the cornerstone provisions of the statute.

2. Whenever a consumer reporting agency prepares a consumer report, § 1681e(b) requires it to follow reasonable procedures to assure maximum possible accuracy of the information about the individual about whom the report relates. 15 U.S.C. § 1681e(b). This section imposes a high, and often disregarded, standard on credit reporting agencies. *See, e.g.*, *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011) (breaking down the

1

requirements of § 1681e(b), and explaining that " 'assure' means 'to make sure or certain: put beyond all doubt,'" "'[m]aximum' means the 'greatest in quantity or highest degree attainable[,]' and 'possible' means something 'falling within the bounds of what may be done, occur or be conceived'" (quoting *Webster's Third New International Dictionary* 133, 1396, 1771 (1993)).

3. Defendant Advantage Credit, Inc., is a "reseller" of consumer reports that assembles and merges information in the databases of the "Big 3" nationwide consumer reporting agencies—Experian, Equifax, and Trans Union. Defendant "resells" this merged information in what is called a "tri-merged credit report" to various third parties, such as mortgage lenders. Like a traditional consumer reporting agency, the FCRA mandates that resellers use reasonable procedures to assure maximum possible accuracy whenever they publish a consumer report. *See* 15 U.S.C. § 1681a(u) (defining a reseller as a consumer reporting agency when it assembles and merges information in the database of another consumer reporting agency and does not maintain a database of its own from which new reports are produced).

4. Even though it is a reseller of the information, Defendant has no procedures at all to assure the accuracy of the information it publishes about consumers. Rather than comply with its independent obligations to assure maximum possible accuracy, Defendant purchases consumer reports from other sources to combine and resell them without policies or procedures in place to ensure that the accuracy of the information, even when the information is incorrect.

5. This lawsuit challenges Defendant's failure to adopt any reasonable procedures to prevent the publication of erroneous foreclosure information in its credit reports. In this case, likely representative of several others, Defendant published the status of Plaintiff's mortgage as "foreclosure" even though it was apparent—on the face of the report—no foreclosure occurred and the loan was instead transferred to another lender. This information was facially inconsistent,

yet Advantage Credit had no procedures in place to prevent the inaccurate foreclosure notation from appearing in Plaintiff's credit report. *See* Federal Trade Commission, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Report with Summary of Interpretations* 67 (July 2011) (explaining that a consumer reporting agency "must maintain procedures to avoid reporting information with obvious logical inconsistencies, such as a credit account opened when the consumer was known to be a minor").

## JURISDICTION

6. This Court has jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1681(p).

7. Venue is proper in this District and Division because a substantial part of the events and omissions giving rise to the claim occurred in this District and Division

## PARTIES

8. Plaintiff is a natural person living within this Division and is a "consumer" as defined by 15 U.S.C. §1681a(c).

9. Advantage Credit is a corporation organized under the laws of Colorado and "reseller" as defined by § 1681a(u) of the FCRA. At all times relevant to this Complaint, Defendant was a business engaged in the assembly of information in the databases of Equifax, Experian, and Trans Union to furnish such information to third parties.

## FACTUAL ALLEGATIONS

**A.  Defendant is a reseller of consumer reports.**

10. The Big 3 consumer reporting agencies—Experian, Equifax, and Trans Union—regularly receive information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, the Social Security Administration, and others.

11. Experian, Equifax, and Trans Union collect their credit information from thousands of sources and distribute that information to their customers/subscribers, such as Defendant.

12. Although many of their customers are creditors, Experian, Equifax, and Trans Union generate significant revenue by selling credit information to "resellers" of consumer reports, like Defendant.

13. After receiving the credit information (usually at a lower cost because of their volume) from the credit bureaus, resellers then assemble and merge the credit information obtained into a 3-bureau credit report, also known as a "tri-merge" or "merged infile" credit report, and sell them to various mortgage lenders throughout the country.

14. Tri-merge credit reports are unique to the mortgage industry because applying for a mortgage loan is different in many ways from applying for other types of loans, such as a credit card, where a creditor often obtains credit information from just one credit bureau.

15. When Defendant requests credit information from the credit bureaus for a particular consumer, the credit information is exchanged via an automated process, and the credit bureaus send the raw credit data to Defendant electronically.

16. After receiving the raw credit data from the credit bureaus for a particular consumer, Defendant assembles, merges, and normalizes the credit information into a Merged Infile credit report.

17. Defendant is therefore a "reseller" as defined at 15 U.S.C. § 1681a(u), which is a "consumer reporting agency that—(1) assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party, to the extent of such

activities; and (2) does not maintain a database of the assemble or merged information from which new consumer reports are produced."

**B.     Plaintiff's experience and Defendant's lack of procedures.**

18.     Several years ago, Ms. Mozaffarian owned a home that was subject to a mortgage serviced by Bank of America.

19.     In 2014, Ms. Mozaffarian experienced financial difficulties and fell behind on her monthly mortgage payments.

20.     To avoid a potential foreclosure and further damage to her credit, Ms. Mozaffarian decided to sell the home through a short sale.

21.     Before the completion of the short sale, Bank of America transferred her mortgage to RCS Mortgage.

22.     The sale was completed on June 30, 2015, and Ms. Mozaffarian's mortgage was settled and paid for less than the full balance as part of a short sale.

23.     In September 2020, Ms. Mozaffarian was seeking to take advantage of the historically low interest rates and applied for a mortgage with Mortgage 4U, LLC.

24.     As part of her mortgage application, Mortgage 4U requested Ms. Mozaffarian's credit report from Advantage Credit.

25.     The credit report that Advantage Credit reported her prior Bank of America mortgage with a status of "foreclosure."

26.     Advantage Credit's reporting was inaccurate, incomplete, and materially misleading because her mortgage was not foreclosed.

27. In addition, Advantage Credit should have known that its reporting of a foreclosure was inaccurate because it also reported that the Bank of America account was also "transferred to another lender."

28. This reporting was inaccurate, illogical, and facially inconsistent. If a foreclosure had actually occurred, there would be no reason for the loan to be transferred to another lender.

29. Advantage Credit knew or should have known that its false reporting of the foreclosure status would limit Ms. Mozaffarian's ability to obtain credit.

30. For example, Discover Bank's website explains that the "status" of an account section of a credit report is an important section that lenders view to assess credit risk and determine interest rates. *See Understanding Status of Accounts on a Credit Report*, Discover, https://www.discover.com/credit-cards/resources/status-of-accounts-on-credit-report/; *see also What's the "Status of Accounts" Section of My Credit Report?*, myFICO blog (Mar. 7, 2019) ("The 'Status of Accounts' section is viewed by lenders so they can assess your creditworthiness. It also enables them to determine how high (or low) a lending risk you are and how high (or low) your loan interest rate will be."), https://blog.myfico.com/whats-the-status-of-accounts-section-of-my-credit-report/.

31. As another example, an Experian blog post on its website explains that "settling an account is typically viewed more favorably than not paying it at all." Stacy Smith, Is it Better to Pay off Bad Debt or to Settle it?, Experian (June 20, 2017), https://www.experian.com/blogs/ask-experian/is-it-better-to-pay-off-bad-debt-or-to-settle-it/.

32. In fact, most mortgage lenders will not originate a conventional mortgage to anyone who has suffered a foreclosure in the past seven years because both Fannie Mae and Freddie Mac consider those loans ineligible for purchase.[1]

33. Advantage Credit's reporting also contradicts the Industry Standards set forth by the Consumer Data Industry Association (CDIA).

34. The CDIA is a trade association for credit reporting agencies, and its Metro 2 Format is a standardized reporting format used to provide information about consumer accounts to the credit reporting agencies. CDIA's manual is often cited as the industry standard for credit reporting procedures.

35. The Metro 2 Format was developed by a task force comprised of representatives from Equifax, Experian, Innovis, and Trans Union. "The task force's mission is to provide a standardized method for the reporting of accurate, complete and timely data." CDIA, *Credit Reporting Resource Guide* 1-2 (2015).

36. The CDIA's manual specifically addresses the issue of when to use a foreclosure status. Among other things, the CDIA's manual instructs that "foreclosure proceeding started… should be reported each month as long as the comment applies." *Id*. at 6-67. By contrast, if a foreclosure has been cancelled, furnishers are instructed to "stop reporting the comment" related to the foreclosure and it "will be deleted from the consumer reporting agencies' files." *Id*.

---

[1] Fannie Mae: https://selling-guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/Subpart-B3-Underwriting-Borrowers/Chapter-B3-5-Credit-Assessment/Section-B3-5-3-Traditional-Credit-History/1032994681/B3-5-3-07-Significant-Derogatory-Credit-Events-Waiting-Periods-and-Re-establishing-Credit-08-07-2019.htm#Foreclosure (last visited July 9, 2021)
Freddie Mac: https://guide.freddiemac.com/app/guide/section/5202.5 (last visited July 9, 2021).

37. As a result of Advantage Credit's inaccurate and misleading reporting, Ms. Mozaffarian's mortgage application was initially denied and she suffered significant emotional distress, including embarrassment.

**C.     Defendant's violations of the FCRA are willful.**

38. The Supreme Court has held that willfulness under the FCRA encompasses not only a knowing violation but also a violation committed in reckless disregard of statutory obligations. *Safeco Insurance Company of America v. Burr*, 551 U.S. 47 (2007).

39. Recklessness is measured by an objective standard: conduct that creates an "unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 68.

40. Here, Defendant willfully violated the FCRA because its procedures caused an unjustifiably high risk of harm that was either known or was so obvious it should have been known. More specifically, Defendant had information available to it—including information included in the report—showing that Plaintiff's mortgage was not foreclosed.

41. As the Federal Trade Commission has explained, reasonable procedures to assure maximum possibly accuracy include "establish[ing] procedures to avoid reporting information from its furnishers that appears implausible or inconsistent." FTC, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Report with Summary of Interpretations* 67 (July 2011), available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

42. A credit reporting agency "must maintain procedures to avoid reporting information with obvious logical inconsistencies, such as a credit account opened when the

consumer was known to be a minor" or, as here, where a consumer's mortgage was reported as erroneously foreclosed even though it was actually transferred.

43. If Defendant had reasonable procedures in place in line with the FTC's guidelines and the plain language of the FCRA, Defendant would not have reported the inaccurate, derogatory information about Plaintiff.

44. Defendant's conduct was also willful because it knew or should have known of the inadequacy of its procedures through lawsuits in other jurisdictions against its competitors. *See, e.g.*, *Ocasio v. CoreLogic Credco, LLC*, 2015 WL 5722828, at *3 (D.N.J. Sept. 29, 2015) (denying summary judgment in a § 1681e(b) case because the reseller "reiterated inaccurate information and did not independently verify the data it received."); *Starkey v. Experian Info. Sols., Inc.*, 32 F. Supp. 3d 1105, 1109 (C.D. Cal. 2014) (rejecting a reseller's summary judgment argument that "a reseller provides an 'accurate' report simply by accurately reproducing the information furnished to it by other credit bureaus.").

45. Upon information and belief, Defendant has also been notified of the inadequacy of its procedures through disputes submitted by consumers and complaints from mortgage companies.

46. Despite these complaints and lawsuits, Defendant has continued to rely on its inadequate procedures to the detriment of Plaintiff and class members.

### COUNT ONE: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b)
### Class Claim

47. Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length here.

48. Under Fed. R. Civ. P. 23, Plaintiff sues individually and on behalf of a class initially defined as follows:

> All natural persons who were the subject: (1) of a consumer report furnished by the Defendant to a third party within the five years preceding the filing date of this Complaint; (2) where the report contained a status indicating that the a mortgage was foreclosed; and (3) where the report or information possessed by Defendant indicated that the mortgage was resolved by something other than a foreclosure, including because it was transferred to another lender.
>
> Plaintiff is a member of this class.

49. **Numerosity**. Upon information and belief, Plaintiff alleges that the class is so numerous that joinder of the claims of all class members is impractical. The class members' names and addresses are identifiable through the Defendant's documents and records and they may be notified of the pendency of this action by publication or mailed notice.

50. **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative class members. These questions predominate over the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether Defendant blindly includes a facially inconsistent foreclosure notation that it obtains from credit bureaus into its reports with no procedure to assure the accuracy or completeness of the underlying data; (b) whether this conduct violated the FCRA; and (c) whether the violation was negligent, reckless, knowing, or intentionally committed in conscious disregard of the Plaintiff's and putative class members' rights.

51. **Typicality**. Plaintiff's claims are typical of the claims of each putative class member and all claims are based on the same facts and legal theories. Plaintiff, as every putative class member, alleges a violation of the same FCRA provision, 15 U.S.C. §1681e(b). This claim challenges the Defendant's consumer reporting procedures and does not depend on any individualized facts. For purposes of class certification, Plaintiff seeks only statutory and punitive

damages. Such damages are appropriate in circumstances like this one where injuries are particularized and concrete, but difficult to quantify, rendering the recovery of class statutory damages ideal and appropriate. Plaintiff is also entitled to the relief under the same causes of action as the other class members.

52. **Adequacy**. Plaintiff will fairly and adequately protect the class's interests. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative class and has accepted such responsibilities.

53. Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

a. As alleged above, the questions of law or fact common to the class members predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. The statutory and punitive damages sought by each member are such that the individual prosecution would prove burdensome and expensive given the complex and extensive litigation required by Defendant's conduct. Further, those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually. Most consumers affected by Defendant's conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in

federal litigation. Individual litigation of the uniform issues here would be a waste of judicial resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one consumer would set the law for every similarly situated consumer.

54. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in preparing the consumer reports it published and maintained about the Plaintiff and the putative class members by blindly publishing foreclosure notations from Experian, Equifax, and Trans Union even though it contradicted other information in the report.

55. Defendant's violation of 15 U.S.C. § 1681e(b) was willful, rendering the Defendant liable under 15 U.S.C. § 1681n. In the alternative, the Defendant was negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.[2]

56. In addition, the Plaintiff and each class member suffered an actual injury because of the Defendant's violation, as alleged here.

57. Plaintiff and the putative class members are entitled to recover statutory damages, punitive damages, costs, and attorney's fees from the Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

WHEREFORE, Plaintiff moves for class certification and for judgment against the Defendant for statutory damages, punitive damages, and attorneys' fees and costs, as well as any other relief that the Court finds just and appropriate.

**TRIAL BY JURY IS DEMANDED.**

---

[2] Plaintiff seeks statutory and punitive damages on behalf of herself and others. If class certification is denied, Plaintiff intends to seek actual damages for Defendant's violation.

Respectfully submitted,
**ROMINA MOZAFFARIAN**

By: ____*/s/ Kristi C. Kelly*____
Kristi C. Kelly (Bar No. 07244)
J. Patrick McNichol (Bar No. 19034)
**Kelly Guzzo, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 – Telephone
(703) 591-0167 – Facsimile
Email: kkelly@kellyguzzo.com
Email: pat@kellyguzzo.com

*Counsel for Plaintiff*